## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Asije H.,<br><br>              Plaintiff,<br><br>v.<br><br>Martin O'Malley, Commissioner of Social Security,[1]<br><br>              Defendant. | Civil No. 3:23-CV-00522-TOF<br><br><br><br>May 13, 2024 |

### RULING ON PENDING MOTIONS

The Plaintiff, Asije H.,[2] appeals the decision of the Commissioner of Social Security ("Commissioner" or "Defendant") rejecting her application for disability insurance benefits under Title II of the Social Security Act. (Compl., ECF No. 1.) She has moved the Court "for an order reversing or remanding the decision" of the Administrative Law Judge, or "ALJ." (ECF No. 17.) The Commissioner asks the Court to affirm, arguing that the ALJ's decision was "supported by substantial evidence and made by a correct application of legal principles." (ECF No. 21.)

The Plaintiff makes five principal claims of error. (*See* Pl.'s Memo. of L., ECF No. 17-1) ("Pl.'s Memo."). First, she claims that the ALJ erred at Step Two of the five-step process for evaluating Social Security disability claims when he concluded that her obesity was not a severe

---

[1]     When she filed her complaint, the Plaintiff named the then-acting Commissioner of Social Security, Kilolo Kijakazi, as the defendant. (ECF No. 1, at 1.) Since then, President Biden nominated and the Senate confirmed Martin O'Malley as the Commissioner. Commissioner O'Malley is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d). The Clerk of the Court is respectfully directed to amend the caption of the case accordingly.

[2]     Pursuant to the Court's January 8, 2021 Standing Order, the Plaintiff will be identified solely by first name and last initial, or as "Plaintiff," throughout this opinion. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

impairment.  (*Id*. at 2-6.)  Second, she claims that he committed another error at Step Two when he held that her obstructive sleep apnea was also not severe.  (*Id.* at 6-8.)  Third, she says that the ALJ faulted her for not using her prescribed C-PAP machine, and she argues that this was reversible error in the context of her claim.  (*Id.* at 8-10.)  Fourth, she contends that the ALJ failed to follow the applicable Social Security Administration ("SSA") regulations when reviewing the medical opinion evidence.  (*Id*. at 10-23.)  Fifth and finally, she says that there was an "obvious gap" in the administrative record, and that the ALJ erred when he proceeded to a decision without taking all reasonable steps to fill that gap.  (*Id.* at 23-25.)

The Court agrees with the Plaintiff on her fifth claim.  Under the unusual circumstances of this case, it was error for the ALJ to proceed to a decision without making further efforts to obtain additional records from the Plaintiff's treating psychiatrist, Dr. Alessandra Buonopane.  The Plaintiff's Motion for Order (ECF No. 17) will therefore be granted; the Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 21) will be denied; and the case will be remanded for further proceedings.  The Court will not reach the Plaintiff's other claims of error; instead, it will direct the Commissioner to consider them on remand.

I.     FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff is a fifty-one-year old woman who suffers from major depressive disorder and panic disorder.  (R. 620.)  Her conditions emerged in 2016-2017, after her mother developed cancer.  (*See* R. 593.)  The Plaintiff had worked as a hostess at her husband's restaurant  (R. 273), but as her symptoms worsened, she began to "hurt[] the business" because she was "irrita[ble]" with the customers.  (R. 109-10.)  She quit her job on January 31, 2017, and she says that she has not worked since.  (R. 272.)

In early 2018 the Plaintiff began seeing a new primary care physician, Dr. Ashanee Thompson. (R. 337.) At her first visit on January 12, her principal complaint was stomach pain, but she also told Dr. Thompson that she suffered from anxiety and depression.[3] (*Id.*) The doctor restarted lapsed prescriptions for Xanax and Paxil, but she added that "[i]f the patient continues to require Xanax for her anxiety I will refer her to psychiatry for further treatment and management." (R. 341.) When the Plaintiff continued to report symptoms at a follow-up visit in April, Dr. Thompson referred her to a psychiatrist, Dr. Arvind Shah. (*See id.*; *see also* R. 329.)

Dr. Shah examined the Plaintiff on April 25, 2018. (R. 329.) He "noticed [her] to be very anxious, tense, edgy and very preoccupied with negative feelings." (*Id.*) He did not observe any evidence of psychosis, but he did note that the Plaintiff "showed very poor insight" into her symptoms. He diagnosed her with panic disorder – but not with depressive disorder – and increased her Paxil dosage. (R. 329-30.) He also "emphasi[zed]" that the Plaintiff should pursue "counseling to develop better insight with regard to her panic attacks and develop appropriate coping skills and developing much more socialization so that eventually she can return back to work[.]" (R. 330.)

The Plaintiff did not undergo much other mental health treatment in 2018, apparently because of problems with her insurance. (*See* R. 363 (July 25, 2018 medical note from Dr. Thompson, stating that "[p]atient was sent to psych but due to insurance change she was not able to see the psychiatrist"); *but see* R. 468 (December 7, 2018 record of emergency room visit "for

---

[3]    The ALJ apparently thought that this was the first time the Plaintiff sought treatment for anxiety or depression. (R. 23) (stating that, "[a]lthough the claimant allegedly stopped working due to her mental impairments in January 2017, she did not seek treatment until about a year later"). Dr. Thompson's notes make clear, however, that the Plaintiff had been previously diagnosed with anxiety and depression by another treatment provider, and that she had been prescribed Xanax and Paxil. (R. 337.) That provider's treatment notes are not contained in the administrative record.

evaluation of anxiety").)  She returned to Dr. Shah only once, on May 16, 2018.  (R. 333.)  From the fall of 2019 to the summer of 2020, she discussed her mental health issues with an internist, Dr. Faraz Khan.  (*E.g.*, R. 408.)  Dr. Khan observed worsening anxiety and depression symptoms over the course of several months (*e.g.*, R. 408 ("Her depression seems to be much worse"); R. 431 ("Anxiety and depression: Getting worse")), but generally noted normal mood, affect, and behavior.  (*E.g.*, R. 419, 428, 434.)

The Plaintiff applied for disability insurance benefits on August 13, 2020.  (R. 134.)  She claimed to have been disabled since January 31, 2017, the day on which she quit her job at her husband's restaurant.  (R. 236, 268, 272.)  When asked to "[l]ist all of the physical or mental conditions . . . that limit your ability to work," she listed "depression," "panic attacks," and "sleep apnea."  (R. 272.)

After she applied for benefits, the Plaintiff began treating with a psychiatrist named Alessandra Buonopane.  (R. 459.)  At her initial visit on September 11, 2020, the Plaintiff explained to Dr. Buonopane that she was "home all of the time," "need[ed] to take Xanax to go out," and did "not want to stay around people."  (*Id.*)  She stated that her symptoms began three years before with feelings of being "overwhelmed" and "paranoid."  (R. 460.)  She also stated that she had "difficulty sleeping."  (R. 459.)  Dr. Buonopane conducted a mental status exam, noting "fluent, well organized, coherent, and logical" speech along with proper orientation "to person, place, and time."  (R. 460.)  Yet while the Plaintiff denied suicidal ideation, and while she then denied hallucinations, Dr. Buonopane nonetheless observed evidence of psychosis in the Plaintiff's "paranoid thoughts."  (R. 460-61.)  The doctor diagnosed "[major depressive disorder] with

paranoid thoughts" and "panic disorder with agorophobia [*sic*]," and she started the Plaintiff on Seroquel.[4]  (R. 461.)

The Plaintiff treated with Dr. Buonopane "[an] average [of two times per] month or more" between September 2020 and September 2021.  (R. 620.)  Although this would suggest that there should be at least twenty-four treatment notes in the record, there are only three.  (R. 463.)  The first such note discloses that the Plaintiff saw Dr. Buonopane on September 30, 2020, and that she reported continuing depression despite improvement in her sleep patterns.  (*Id.*)  The second note is dated October 22, 2020, and it records the Plaintiff as stating that her fatigue had returned (*id.*) (recounting that "she was found asleep despite the time 6PM"), and the doctor adding Wellbutrin to her medication regimen because of continuing "low energy and motivation[.]"  (*Id.*)  In the third note, dated December 2, 2020, the Plaintiff "continue[d] to be very depressed and complain[ed] about sleep and energy level."  (*Id.*)  Dr. Buonopane adjusted her medications yet again, and she discussed a "higher level of care" at the Institute of Living or Yale University.  (*Id.*)  From there, however, the trail goes cold; the administrative record contains no progress or psychotherapy notes from Dr. Buonopane after December 2, 2020.  (*See* R. 459-63.)

While the Plaintiff was treating with Dr. Buonopane, the SSA referred her to a consultative examination with a psychologist named Erica Preston.  (R. 593.)  Dr. Preston saw the Plaintiff only once, and not in person.  (*Id.*) (stating that the "appointment . . . was conducted via telehealth due to the COVID-19 pandemic").  Moreover, Dr. Preston evidently did not review the Plaintiff's medical records before the examination.  (*Id.*) ("The following report is based solely on an

---

[4]     Seroquel is a brand name for quetiapine, "an antipsychotic medicine" that "is used alone or together with other medicines to treat bipolar disorder (depressive and manic episodes) and schizophrenia."  Mayo Clinic, *Drugs and Supplements: Quetiapine (Oral Route)*, available at https://www.mayoclinic.org/drugs-supplements/quetiapine-oral-route/description/drg-20066912 (last visited May 13, 2024).

interview with the claimant."). In her post-examination report, the doctor wrote that the Plaintiff "appears to be largely inactive and isolative due to her mental health conditions, and her ability to tolerate stress and interact well with others has declined in recent years." (R. 595.) She diagnosed the Plaintiff with unspecified anxiety and depressive disorders, and she assessed "mild to moderate" impairments in several areas of mental functioning. (*Id.*)

The SSA then asked another psychologist, Christopher Leveille, to review the Plaintiff's case. (R. 129.) Dr. Leveille noted that, when Dr. Preston attempted to conduct a Montreal Cognitive Assessment exam, the Plaintiff did not "put[] forth adequate effort." (R. 128, 593.) He also noted that the Plaintiff reported "panic attacks two or three times a day" to Dr. Preston, and he stated that this claim was "clearly contradicted" by an earlier medical report. (R. 128, 594.) He therefore largely discounted the history portions of Dr. Preston's report, instead placing his "[primary] focus . . . on the objective data." (R. 128.) Observing no evidence "of mood cycling, psychosis or risk," and further observing an absence of inpatient treatment, he concluded that the Plaintiff's symptoms were "not differentiated from medical factors (e.g., obesity, sleep apnea)." (R. 128-29.) He accordingly endorsed Dr. Preston's mental residual functional capacity assessment, adding that the Plaintiff "would likely benefit from returning to work." (R. 128-29.)

The SSA denied the Plaintiff's claim for disability insurance benefits at the initial level on May 4, 2021. (R. 124, 133.) The Plaintiff requested reconsideration on May 18, 2021. (R. 158.) At the reconsideration level, the SSA asked John Warren, Ed.D., to review the case. (R. 139.) Dr. Warren cut-and-pasted Dr. Leveille's evaluation into his own report, adding only a single, short paragraph of his own. (R. 138.) In that paragraph, Dr. Warren noted that in the six weeks since Dr. Leveille's report, there had been "no mental worsening alleged, no new mental source(s) identified," nor any "medical evidence contemporaneous with the [Title II] review period added

to the file." (*Id.*)   He nonetheless assessed the Plaintiff with a higher level of limitation –

"moderate" as opposed to "mild" – in the dimension of "[a]dapt[ing] or manag[ing] oneself."

(*Compare* R. 138 *with* R. 128.)   Still, he concluded that the "claimant retains the capacity to

perform basic tasks and relate with others well enough for routine workplace purposes." (*Id.*)   The

SSA then denied the Plaintiff's claim at the reconsideration level on June 16, 2021. (R. 144.) On

June 30, 2021, the Plaintiff requested a hearing before an ALJ. (R. 185.)

On July 7, 2021, the SSA wrote to the Plaintiff to "explain[] the hearing process and things

that [she] should do now to get ready for [her] hearing." (R. 160.)   In that letter, the agency

explained that the Plaintiff bore the burden "to inform us about or submit all evidence known to

[her] that relates to whether or not" she was disabled. (R. 161.)   It added, however, that it could

"help [her] get evidence." (*Id.*)   The SSA explained that "[i]f a physician, expert, or other person

is not providing documents important to" her case, she could "ask the ALJ to issue a subpoena."

(*Id.*)   It stated that "[t]he ALJ will issue a subpoena only if he or she thinks the evidence is

necessary to decide [the] case, and the evidence cannot be obtained any other way." (*Id.*)   The

agency further advised the Plaintiff that, if she wanted to ask the ALJ to issue a subpoena, she had

to do so in writing at least ten days before the hearing. (*Id.*)

While the hearing was being scheduled, the Plaintiff's attorney obtained a twenty-three-

page medical source statement from Dr. Buonopane. (R. 619-41.)   In that statement, the doctor

reported diagnosing the Plaintiff with "major depression *with psychosis*" (R. 620) (emphasis

added) – a diagnosis that no other doctor had reported (*see, e.g.*, R. 488) (March 6, 2021 report

from Dr. Khan, listing "[c]urrent severe episode of major depressive disorder *without* psychotic

features" among the Plaintiff's active problems) (emphasis added), and the absence of which had

been noteworthy to both Drs. Leveille and Warren.[5]  (R. 128, 139.)  Dr. Buonopane also reported profound impairments in many areas of mental functioning.  She wrote, for example, that the Plaintiff had a "very serious problem" with "[u]sing appropriate coping skills to meet ordinary demands of a work environment without assistance," "[i]nteracting appropriately with other[s] in a work environment without assistance," and "[g]etting along with other[s] without distracting them [by] exhibiting behavioral extremes."  (R. 625.)  She also stated that the Plaintiff had "no useful ability to function" in the dimensions of "[p]erform[ing] at a consistent pace without an unreasonable number and length of rest periods," "[a]sk[ing] simple questions or request[ing] assistance," and "[d]eal[ing] with normal work stress."  (R. 634-35.)

The SSA assigned ALJ Ryan Alger to the case, and Judge Alger scheduled a hearing for February 3, 2022.  (R. 203-07.)  Although the Plaintiff's attorney had been able to obtain a medical source statement from Dr. Buonopane, she was still having trouble getting the doctor's full treatment notes as the hearing approached.  (*See* R. 313.)  She therefore wrote to the ALJ on January 20, 2022, ten business days before the hearing, and asked him to issue subpoenas to Dr. Buonopane and other "noncompliant" providers.  (R. 312-14.)  The ALJ did not issue a subpoena, but instead went forward with the hearing as scheduled.  (R. 104.)

After the hearing, the Plaintiff's attorney wrote a letter to the ALJ about missing medical records.  (R. 327.)  Dr. Buonopane had referred the Plaintiff to another doctor for transcranial magnetic stimulation therapy, but she had "not furnished her most recent updated records which presumably contain this referral."  (*Id.*)  More broadly, the doctor "did not provide her most recent progress notes."  (*Id.*)  The Plaintiff's attorney therefore requested an additional thirty days in

---

[5]     The Plaintiff also treated with a Licensed Clinical Social Worker named Rebecca Stamat. (*See*. R. 704-49.)  LCSW Stamat's psychotherapy notes reflect that the Plaintiff reported auditory and visual hallucinations in an August, 2021 telehealth session.  (R. 720.)

which to attempt to "receive and submit the records."  (*Id.*)  The ALJ granted this request, but he added that if he did not receive the additional evidence by March 3, 2022, he would issue his decision without it.  (R. 328.)

The records did not come, and the ALJ therefore decided the case on March 28, 2022.  (R. 16-29.)  As will be explained below, ALJs must follow a five-step sequential evaluation process in deciding Social Security disability claims, and the ALJ's decision followed that format.  At Step One, he concluded that the Plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of January 31, 2017 through her date last insured of March 31, 2021." (R. 18.)  At Step Two, he determined that the Plaintiff suffered from the severe impairments of anxiety disorder and depressive disorder, but that her other ailments – sleep apnea, obesity, bilateral knee pain, vertigo, status post cholecystectomy, and supraventricular tachycardia – were "non-severe" when considered both "singly and in combination."  (R. 19.)  At Step Three, he concluded that the Plaintiff's impairments did not meet or medically equal any of the "Listings" – that is, the impairments listed in Appendix 1 to 20 C.F.R. Part 404, Subpart B.  (R. 20-22.)  Relying in part on Dr. Thompson's primary care notes and on Dr. Preston's video exam, the ALJ determined that "[b]ecause the claimant's mental impairments did not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria" for Listings 12.04 and 12.06 "were not satisfied."  (R. 20-21.)

The ALJ then determined the Plaintiff's residual functional capacity, or "RFC."  (R. 22-27.)  He concluded that the Plaintiff "had the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations:  she can carry out and remember simple instructions, can maintain attention and concentration on simple tasks with normal breaks, and can have occasional interaction with coworkers, but can have no interaction

with the general public." (R. 22.)  In reaching this conclusion, he found Dr. Warren's brief opinion "persuasive" because it was "consistent with and supported by the medical evidence." (R. 25.) He considered Dr. Leveille's earlier report to be only "partially persuasive," because "the moderate limitation in adapting or managing oneself is not supported, given the lack of suicidal ideations or psychiatric hospitalizations during the period at issue and generally fair insight and judgment noted by treating providers."[6]  (*Id.*)  The ALJ then found the report of Dr. Preston's video examination to be "partially persuasive."  Where Dr. Preston found no limitation or a mild limitation, the ALJ found her report to be "consistent with the treatment records noting occasionally flat affect and the claimant's panic attacks and insomnia[;]" but where the doctor found a moderate limitation, her report was "not well-supported, in light of the one-time examination and findings of fair insight and judgment." (*Id.*)  The ALJ also discounted as "unpersuasive" two medical source statements from LCSW Stamat.  (R. 25-26.)

The ALJ also reviewed the twenty-three-page medical source statement from Dr. Buonopane.  (R. 26.)  He found the opinion to be "unpersuasive" because it was "not well-supported by her generally unremarkable progress notes[.]"  (*Id.*)  He also observed that the opinion was "internally inconsistent in that it notes some mild to moderate limitations and some extreme limitations within the same domain" – as, for example, when it found that the Plaintiff had "only slight problems in interacting appropriately with others in the workplace" but "no ability to function in interacting appropriately with the public[.]"  He added that the "opinion is also inconsistent with the other mental health evidence, such as the consultative examination and other treatment providers' progress notes." (*Id.*)

---

[6]  The ALJ appears to have mixed up the initial and reconsideration consultants.  It was Dr. Warren, not Dr. Leveille, who assessed the Plaintiff with a "moderate" limitation in the dimension of adapting and managing herself.  (*Compare* R. 128 *with* R. 138.)

At Step Four of the five-step evaluation process, the ALJ used the RFC he had derived to conclude that, "[t]hrough the date last insured, the claimant was unable to perform" her past relevant work as a waitress. (R. 27.) At Step Five, he relied on hearing testimony from a vocational expert in determining that the Plaintiff could nevertheless perform the jobs of "kitchen helper," "marker," and "routing clerk." (R. 28.) He therefore concluded that "the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (*Id.*) He ended by holding that "[t]he claimant was not under a disability, as defined in the Social Security Act, at any time from January 31, 2017, the alleged onset date, through March 31, 2021, the date last insured." (*Id.*) His opinion did not address the Plaintiff's attorney's requests for subpoenas. (R. 16-28.)

The Plaintiff appealed to the Appeals Council the next day. (R. 234-35.) Nearly a year later, the Council denied her request for review. (R. 1.) The Plaintiff then sued in this Court (Compl., ECF No. 1), and the Commissioner answered her complaint by filing a certified copy of the administrative record. (ECF No. 11); *see also* Suppl. R. for Soc. Sec. 4(b). The Plaintiff filed a motion for remand (ECF No. 17), and the Commissioner filed a motion to affirm. (ECF No. 21.) The Plaintiff did not file a reply brief, and her time for doing so has expired. *See* Suppl. R. for Soc. Sec. 8. Neither party requested oral argument, and accordingly the motions are ripe for decision.

## II.   APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740

11

F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)).   To determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity . . . ."  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)).   At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments . . . ."  *Id.*   At Step Three, the ALJ then evaluates whether the claimant's disability "meets or equals the severity" of one of the Listings. *Id.*   At Step Four, the ALJ uses an RFC assessment to determine whether the claimant can perform any of her "past relevant work."  *Id.*   At Step Five, the ALJ addresses "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience."  *Id.*   The claimant bears the burden of proving her case at Steps One through Four.  *Id.*   At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).   Its role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal error.   "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner.  *See Williams v.*

*Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion') (citations omitted). Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted).  When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment.  "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if he has made a material legal error.  In other words, district courts do not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.   DISCUSSION

As noted in the introduction, the Plaintiff asserts five principal claims of error.  First, she asserts that the ALJ erred at Step Two when he concluded that her obesity was not a severe impairment.  (Pl.'s Memo., at 2-6.)  Second, she claims that he erred again at Step Two when he held that her obstructive sleep apnea was likewise non-severe.  (*Id.* at 6-8.)  Third, she says that the ALJ wrongly faulted her for not using her prescribed C-PAP machine.  (*Id.* at 8-10.)  Fourth, she contends that the ALJ improperly applied the regulations governing the treatment of opinion

evidence.  (*Id*. at 10-23.)  Fifth and finally, she says that there was an "obvious gap" in the administrative record, and it was error for the ALJ to proceed to a decision without taking all reasonable steps to fill that gap.  (*Id.* at 23-25.)

I begin my analysis by observing that these claims should be addressed in a different order. The Plaintiff's claim about the development of the administrative record appears last in her brief (*id.* at 23-25), but courts ordinarily address such claims first, because "[w]hether the ALJ has met her duty to develop the record is a threshold question that must be addressed before the court can consider whether the Commissioner's final decision was supported by substantial evidence." *Trasielyn A. v. Kijakazi*, No. 3:21-cv-253 (TOF), 2022 WL 4129343, at *5 (D. Conn. Sept. 12, 2022); *accord Robles v. Saul*, No. 3:19-cv-1329 (TOF), 2020 WL 5405877, at *3 (D. Conn. Sept. 9, 2020) ("An analysis of the decision's congruence with applicable law typically comes first, because even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision.") (citation, quotation marks, and brackets omitted); *Crews v. Astrue*, No. 10-Civ.-516 (LTS) (FM), 2012 WL 1107685, at *14 (S.D.N.Y. Mar. 27, 2012), *report and recommendation adopted*, 2012 WL 2122344 (S.D.N.Y. June 12, 2012) (stating that courts "must be satisfied that a claimant has had a fully and fair hearing before determining whether the Commissioner's conclusions are supported by substantial evidence").  I will therefore address this claim first, even though the Plaintiff raised it last.

The basic legal principles governing this challenge are well established.  As the Second Circuit has explained, "[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).  This duty includes the duty to "develop a complete medical history

of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability." *Shackleford v. Saul*, No. 3:19-cv-1278 (TOF), 2020 WL 3888037, at *3 (D. Conn. July 10, 2020) (quoting 42 U.S.C. § 423(d)(5)(B)).  The duty exists even where, as here, the claimant is represented by an attorney at the administrative level.  *Perez*, 77 F.3d at 47 (citing *Baker v. Bowen*, 886 F.2d 289, 292 n.1 (10th Cir. 1989)).  And full development of the record "is particularly important where an applicant alleges that [s]he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace." *Martinez v. Saul*, No. 3:19-cv-1017 (TOF), 2020 WL 6440950, at *4 (D. Conn. Nov. 3, 2020) (quoting *Merriman v. Comm'r of Soc. Sec.*, No. 14-Civ.-3510 (PGG/HBP), 2015 L 5472934, at *19 (S.D.N.Y. Sept. 17, 2015)).  When an ALJ fails in this duty, he "'commits legal error.'" *Rose v. Comm'r of Soc. Sec.*, 202 F. Supp. 3d 231, 239 (E.D.N.Y. 2016) (quoting *Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999)) (brackets omitted).

The ALJ's duty to develop the record is not unlimited.  As then-Judge Sotomayor once explained, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5. 1999).  Moreover, the SSA's regulations require the ALJ to take only reasonable steps to fill gaps; he is not required to do the unreasonable or the impossible.  *See* 20 C.F.R. § 404.1512(b)(1) ("We will make every *reasonable* effort to help you get medical evidence from your own medical sources[.]") (emphasis added).  The regulations define "reasonable" steps to include "an initial request for evidence from your medical source . . . and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow-up request to obtain medical evidence necessary to make a determination." *Id.*  Courts therefore often hold that, when the

claimant's treatment provider does not respond to both an initial and a follow-up request for information, the SSA has complied with its obligations and the ALJ may properly proceed to a decision. *E.g., Keys v. Berryhill*, No. 1:16-cv-448 (MAT), 2017 WL 4324689, at *3 (W.D.N.Y. Sept. 29, 2017).

The ALJ does, however, have an additional tool for obtaining records from an unresponsive provider:  an administrative subpoena.  The SSA's regulations state that, "[w]hen it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, on his or her own initiative or at the request of a party, issue subpoenas . . . for the production of . . . records . . . or other documents that are material to an issue at the hearing." 20 C.F.R. § 404.950(d)(1).  When the party asks the ALJ to subpoena records, she must generally do so "at least 10 business days before the hearing date," and her request "must give the name of the witnesses or documents to be produced; describe the address or location of the witnesses or documents with sufficient detail to find them; state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena." 20 C.F.R. § 404.950(d)(2).  The SSA's Hearings, Appeal and Litigation Law Manual ("HALLEX") states that "[i]f an ALJ denies a claimant's request for a subpoena, the ALJ must notify the claimant of the denial, either in writing or on the record at the hearing."  HALLEX I-2-5-78.  "Whether on the record or in writing, the ALJ will explain why the ALJ declined to issue a subpoena." *Id.*

The decision to grant or deny such a request is within the ALJ's discretion.  The regulation contemplates the issuance of a subpoena only "[w]hen it is reasonably necessary for the full presentation of a case," and even then, the ALJ "may" – not "shall" – issue one.  20 C.F.R. § 404.950(d)(1).  The Second Circuit has therefore held that "[t]he plain language of this section

clearly places the decision to issue a subpoena within the sound discretion of the ALJ." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). "But this discretion is not unlimited, and the ALJ 'cannot ignore essential available medical evidence.'" *Thurman v. Comm'r of Soc. Sec.*, No. 17-cv-474 (FPG), 2018 WL 4940726, at *4 (W.D.N.Y. Oct. 12, 2018) (quoting *Outman v. Comm'r of Soc. Sec.*, No. 1:16-cv-988 (MAT), 2018 WL 3688312, at *2 (W.D.N.Y. Aug. 2, 2018)). "The ALJ commits 'harmful error' when she fails to subpoena medical records that are 'reasonably necessary' to the claimant's case." *Id.*

The *Thurman* case illustrates the outer limits of the ALJ's discretion. In that case a Dr. Conshafter had opined that Thurman could not lift more than ten pounds or tolerate prolonged walking, sitting, or standing. *Id.* at *3. The record contained no treatment notes from this doctor, "despite evidence that Dr. Conshafter regularly examined Thurman and took notes at those appointments," and despite the fact that "aside from visits to the emergency room, Dr. Conshafter was his sole source of medical treatment." *Id.* The ALJ sent two letters to the doctor, and when the doctor did not respond, she denied the claimant's disability claim in part because the medical source statement lacked "evidence to support the basis of such significant physical limitations." *Id.* at *4. On appeal, the district court acknowledged the rule of *Yancey*, but it nonetheless held that the ALJ had committed reversible error. *Id.* "Although the ALJ attempted to obtain Dr. Conshafter's treatment records via two letter requests, she should have subpoenaed those records because they were reasonably necessary to the proper resolution of Thurman's case." *Id.* The doctor's "opinion, if credited, might preclude Thurman from performing even sedentary work and thus render him disabled." *Id.* The lack of treatment records therefore "created an obvious gap that the ALJ was obligated to develop." *Id.* "Instead, the ALJ used that gap to Thurman's detriment" when she denied his disability claim in part because of a lack of "detailed explanations,"

"clinical findings," or "evidence to support the basis of such significant physical limitations." *Id.* Had she issued a subpoena, this information "could presumably be found in the relevant treatment notes." *Id.* Because the notes "were reasonably necessary to the ALJ's determination," and "[b]ecause reliance on Dr. Conshafter's opinion could have changed the outcome of th[e] case," "remand [was] required." *Id.* at *5.

The case of *Kennedy v. Commissioner of Social Security* is similarly illustrative. In *Kennedy* the claimant learned that one of her treatment providers produced only 377 pages of its 671-page medical record. No. 17-cv-908 (FPG), 2019 WL 988889, at *3 (W.D.N.Y. Mar. 1, 2019). The ALJ sent two requests for the missing pages, and he held the record open in case the claimant's attorney obtained them herself. *Id.* But when the provider failed to respond, the ALJ denied the claim on a partial record, citing among other things a "lack of evidence in the record" supporting disability. *Id.* at *3-4. When she appealed to the district court, Judge Geraci acknowledged that "it is the burden of the claimant to provide medical evidence to show she is disabled." *Id.* at *2 (citing 20 C.F.R. § 404.1512(c)). He also acknowledged that "the ALJ's obligation to develop the record is not infinite and limitless, and does not extend to circumstances where the record contains sufficient evidence to allow the ALJ [to] make her determination." *Id.* (citing *Guile v. Barnhart*, No. 5:07-cv-259 (GLS), 2010 WL 2516586, at *3 (N.D.N.Y. June 14, 2010)). But when the missing records are voluminous, and when one basis for the finding of no disability was a perceived inconsistency between the claimant's statements about her symptoms and the objective medical evidence, and when another basis for that finding was a "lack of evidence in the record," the ALJ should have "exercise[d] his discretion to subpoena and review" the records, and his "failure to do so require[d] remand." *Id.* at *3-4.

Judge Dooley reached a similar result in *Catherine P. v. Kijakazi*, No. 3:22-cv-1047 (KAD), 2024 WL 1509179 (D. Conn. Mar. 8, 2024).  In that case, the claimant's therapist opined that she "suffered from 'severe anxiety episodes' rendering her unable to work."  *Id.* at *2.  The SSA had not obtained the treatment notes from this therapist, even though the record contained references to "a long-term therapeutic relationship."  *Id.*  On appeal, the claimant contended that this omission constituted a failure to develop the record, and Judge Dooley agreed.  *Id.*  "While not every missing record will require remand or support a determination that the ALJ failed to develop the record," such a determination was proper when the claimant and the therapist had a long relationship, and when the therapist's opinion "made clear that" the claimant "had significant functional limitations due to her mental health."  *Id.*  It was also proper when there was "ample time to obtain these records" between the reconsideration denial and the hearing.  *Id.*  "The fact that essential treatment records were requested, but not received, does not obviate the ALJ's independent duty to develop the record, particularly since the ALJ could have exercised his power to subpoena them, but did not."  *Id.* (quoting *Harris o/b/o N.L.K. v. Berryhill*, 293 F. Supp. 3d 365, 369 (W.D.N.Y. 2018)).

The principles illustrated by these and other, similar authorities may be summarized as follows.  The decision whether to issue a subpoena is within the ALJ's discretion.  *Yancey*, 145 F.3d at 111.  But that discretion is not a license to "ignore essential available medical evidence."  *Thurman*, 2018 WL 4940726, at *4.  If the record contains a medical opinion that, if credited, would confirm disability; and if the record does not contain the opining physician's treatment notes; an ALJ may exceed the limits of his discretion if he denies the claimant's disability claim on the ground that the record does not sufficiently support the opinion, without first issuing a subpoena if the claimant requested one.  *Id.* at *3-5.  Factors affecting this determination include

whether the missing records were voluminous; *Kennedy*, 2019 WL 988889, at *3-4; whether one basis for the finding of no disability was a perceived inconsistency between the claimant's statements about her symptoms and the objective medical evidence; *id.*; whether the claimant and the opining physician had a long-term, therapeutic relationship; *Catherine P.*, 2024 WL 1509179, at *2; and whether there was "ample time to obtain" the records before the hearing. *Id.* And in determining whether an ALJ has exceeded his discretion, courts have also considered whether the ALJ complied with the relevant provisions of HALLEX. *See, e.g., Janet R. v. Comm'r of Soc. Sec.*, No. 1:19-cv-1100 (CJS), 2021 WL 1054369, at *6 (W.D.N.Y. Mar. 19, 2021) (acknowledging that HALLEX "may not have the force of law," but stating that "the ALJ's failure to follow the Hallex's direction in this instance reinforces the Court's conclusion that she abused her discretion by refusing to admit" a medical opinion); *see also Marcano v. Berryhill*, No. 17-Civ.-4442 (KMK) (PED), 2018 WL 5619749, at *12 (S.D.N.Y. July 13, 2018) ("Although failure to follow HALLEX procedures is not error per se, this HALLEX directive reinforces my conclusion that the ALJ erred at step three.").

In this case, these factors support the conclusion that the ALJ exceeded the limits of his discretion when he declined to subpoena Dr. Buonopane's treatment notes. To begin with, Dr. Buonopane's opinion – like Dr. Conshafter's opinion in *Thurman* – would likely establish disability if it were to be fully credited. She opined that the Plaintiff had "[n]o useful ability to function" in the dimensions of "[g]et[ting] along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes" and "[i]nteract[ing] appropriately with the general public." (R. 634-35.) She also opined that the Plaintiff had "[n]o useful ability to function" in the dimensions of "[p]erform[ing] at a consistent pace without an unreasonable number and length of rest periods" and "[d]eal[ing] with normal work stress." (*Id.*) These opinions, if credited,

might support a finding that the Plaintiff has a "marked" or "extreme" limitation in "interact[ing] with others" and "concentrat[ing], persist[ing], or maintain[ing] pace" – two of the four areas of mental functioning in "Paragraph B" of Listings 12.04 and 12.06.[7]

This case is also like *Thurman* in that the ALJ effectively held the lack of treatment notes against the Plaintiff. In *Thurman*, the ALJ "used that gap to Thurman's detriment" when she denied his disability claim in part because of a lack of "detailed explanations," "clinical findings," or "evidence to support the basis of" the significant limitations claimed in the Conshafter opinion.

---

[7]    If a claimant's impairment meets or medically equals the severity of an impairment listed in the Listing of Impairments, she is "presumptively disabled." *Borgos-Hansen v. Colvin*, 109 F. Supp. 3d 509, 512 (D. Conn. 2015). Listing 12.04 concerns "depressive, bipolar and related disorders," and Listing 12.06 concerns "anxiety and obsessive-compulsive disorders." Both listings are expressed in three paragraphs, denominated "A," "B," and "C," and both require the claimant to satisfy Paragraph A and either Paragraph B or C.

In this case, the ALJ did not hold that the Plaintiff failed to satisfy Paragraph A of either listing (*see* R. 20), nor could he reasonably have done so on the record before him. Paragraph A of Listing 12.04 is satisfied when there is medical documentation of "depressive disorder, characterized by five or more of the following: depressed mood, diminished interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, observable psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, or thoughts of death or suicide." Here, all these factors except "psychomotor agitation or retardation" and "thoughts of death or suicide" are documented in the record. (*See, e.g.*, R. 49 (medical note documenting depressed mood); R. 126 (notation by Dr. Leveille that "clt no longer engages in social activities"); R. 54 (medical record indicating "[w]eight has increased"); R. 59-60 (medical record listing "psychophysiologic insomnia" among Plaintiff's "active problems"); *etc.*). Paragraph A of Listing 12.06 is satisfied when there is medical documentation of "anxiety disorder, characterized by three or more of the following: restlessness, easily fatigued, difficulty concentrating, irritability, muscle tension, or sleep disturbance." All but muscle tension are documented in this case. (*See, e.g.*, R. 65 (medical record documenting that Plaintiff reported "fatigue in daytime"); R. 60 ("insomnia"), *etc.*).

In both Listing 12.04 and Listing 12.06, Paragraph B is satisfied if the claimant has an "extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; [and] adapt or manage oneself." Because the Plaintiff satisfied Paragraph A, a medical opinion that she has "no useful ability to function" in two Paragraph B areas might, if credited, establish satisfaction of either Listing and render the Plaintiff "presumptively disabled."

*Thurman*, 2018 WL 4940726, at *4.  The same thing essentially happened here.  The ALJ declined to credit Dr. Buonopane's opinion in part because it was "not well-supported by her generally unremarkable progress notes," but he failed to account for the fact that he had only three of perhaps twenty-four such notes.  (R. 620) (statement of Dr. Buonopane that she saw the Plaintiff an "average [of two times per] month or more" over a one-year period).

The remaining factors likewise support a determination that the ALJ exceeded the boundaries of his discretion.  Here, as in *Kennedy*, the missing records might have documented more than eighty percent of Dr. Buonopane's interactions with the Plaintiff, and they were therefore potentially voluminous.  (*Id.*)  Here, as in *Catherine P.*, the ALJ based his decision in part on a perceived inconsistency between the Plaintiff's statements about her symptoms and the objective evidence.  (R. 22-23) ("[T]he claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]").  And here, as in *Catherine P.*, the SSA had "ample time" to gather the records between the reconsideration decision and the hearing.  (*See* R. 144 (reconsideration decision dated June 16, 2021); R. 104 (hearing transcript, documenting that hearing was held over seven months later).)  While the Plaintiff's therapeutic relationship with Dr. Buonopane was not as lengthy as the relationship in *Catherine P.*, neither was it a one-time examination like Dr. Preston's.  Moreover, the ALJ failed to explain his decision not to issue a subpoena (*see* R. 16-28), even though HALLEX directed him to.  HALLEX I-2-5-78 (stating that the ALJ "must notify the claimant of the denial, either in writing or on the record at the hearing").[8]

---

[8]     To be sure, the Plaintiff's attorney likewise did not fully comply with the requirements governing the issuance of subpoenas.  When a party asks an ALJ to issue a subpoena, 20 C.F.R. § 404.950(d)(2) obliges her not only to make the request "at least 10 business days before the hearing date," but also to "state the important facts that the . . . document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena."  In this case, the Plaintiff's

The Commissioner argues that the Court should nevertheless affirm because the ALJ "had sufficient evidence to reach Plaintiff's RFC even without" the missing records. (Def.'s Memo., at 28.)  His argument has two principal elements.  First, he suggests that Dr. Buonopane was not an especially important player in the Plaintiff's treatment regime, and that obtaining her treatment notes was therefore not essential to the disability determination.  (*Id.*) (characterizing Dr. Buonopane as only "a single provider" who treated the Plaintiff for "less than one year, of which only four months" preceded the date last insured).  Second, he argues that the Plaintiff's mental RFC could be properly ascertained from the "notes from the short counseling sessions Plaintiff attempted[;]" the records from her visits with her primary care physician, "during which [her] psychological and other impairments were thoroughly discussed[;]" and the report from Dr. Preston's one-time video examination.  (*Id.*)

The Court disagrees with both elements of this argument.  With respect to the first, the record is clear that Dr. Buonopane was no bit player in the Plaintiff's treatment regime.  She was the only psychiatrist who met with the Plaintiff more than twice.  (*See* R. 329-33 (medical records evidencing that Plaintiff saw Dr. Shah only twice); R. 620 (opinion stating that Dr. Buonopane saw the Plaintiff on "average [two times a] month or more" for a year, suggesting at least twenty-four visits); R. 493 (stating that Dr. Khan is an internist rather than a psychiatrist)); *cf. also* 20 C.F.R. § 404.1520c(c)(4) (stating that "[t]he medical opinion . . . of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion . . . of a medical

---

attorney made her request ten business days in advance of the hearing, but she did not include all the information required by the regulation.  (*See* R. 313-15.)  Had the ALJ cited these failings in a written explanation of his decision not to issue a subpoena, this factor might therefore stand on a different footing – but he did not.

source who is not a specialist in the relevant area of specialty").  Moreover, she was the only physician who diagnosed the Plaintiff with psychosis.  (*Compare* R. 620 (opinion of Dr. Buonopane, diagnosing the Plaintiff with "major depression with psychosis") *with* R. 329 (report of Dr. Shah, diagnosing only a panic disorder) and R. 488 (report of Dr. Khan, diagnosing the Plaintiff with a "[c]urrent severe episode of major depressive disorder without psychotic features").  And so far as the Court's review discloses, Dr. Buonopane was the only physician who prescribed antipsychotic medication.  (R. 461) (prescribing Seroquel).  Far from being a bit player, Dr. Buonopane was a psychiatric specialist who saw the plaintiff twice a month for a year and claimed to have observed a significant, potentially disabling condition that no other treating physician observed.

With respect to the second element of the argument, the Court disagrees that the primary care and other records provided a sufficient basis for the ALJ's RFC determination.  The Commissioner argues that the Plaintiff's psychological impairments "were thoroughly discussed" in Dr. Thompson's and Dr. Khan's reports, but tellingly he provides no pinpoint citations.  (Def.'s Memo., at 28) (citing the entirety of a 122-page exhibit).  Generally, the "psychiatric" portion of these two physicians' examination reports contained only a single line of text, and it would be a stretch to call them "thorough."  (*See, e.g.*, R. 419) (one-line report stating that the Plaintiff "has a normal mood and affect," and "[h]er behavior is normal").  More importantly, however, the Commissioner's argument misses a key legal point:  courts analyze whether the ALJ's decision was supported by substantial evidence only after first assuring themselves that the record was fully developed.  *Trasielyn A.*, 2022 WL 4129343, at *5 ("Whether an ALJ has met her duty to develop the record is a threshold question that must be addressed before the court can consider whether the Commissioner's final decision was supported by substantial evidence."); *Robles*, 2020 WL

5405877, at *3 ("An analysis of the decision's congruence with applicable law typically comes first, because even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision.") (citation, quotation marks, and brackets omitted).

The Commissioner also argues that the Plaintiff has not shown the missing records to be material (Def.'s Memo., at 29), but this argument is similarly unpersuasive.  It is of course well-established that, when a claimant cites missing records as a basis for remand, she must ordinarily show that those records could have affected the result.  *E.g., Lena v. Astrue*, No. 3:10-cv-893, 2012 WL 171305, at *9  (D. Conn. Jan. 20, 2012) (affirming ALJ's decision in part because the claimant "made no showing that the missing pages are material or that their absence undermined the result").  But a claimant can meet that burden by showing that the missing records were "not cumulative of other evidence[;]" were "likely material to the ALJ's conclusion" respecting key merits issues such as the satisfaction of a Listing; and "also . . . material to the ALJ's findings as to the weight of medical opinions."  *Jessica D. v. Kijakazi*, No. 3:23-cv-605, slip op. at 16-20 (D. Conn. Feb. 22, 2024), *report and recommendation adopted*, slip op.  (D. Conn. Mar. 8, 2024).  In this case, Dr. Buonopane's treatment notes would be the only significant and contemporaneous evidence from a psychiatrist during the critical period immediately before the date last insured – because Dr. Khan saw the Plaintiff only twice during that period and made only brief notes of those visits (R. 54, 65), and because the Plaintiff's other mental health providers were social workers.  (*See* R. 708, 464-67.)  The notes would therefore not be "cumulative of other evidence."  *Jessica D.*, slip op. at 18.  Moreover, the missing records would likely be material to the question of whether the Plaintiff satisfied a Listing, for the reasons discussed above.  And they would also likely affect the analysis of the weight to be given to the Buonopane opinion, because as the ALJ acknowledged,

that analysis is informed by the opinion's consistency with the opining provider's contemporaneous treatment notes. (R. 26.)

The cases cited by the Commissioner in support of his lack-of-materiality argument are not to the contrary. In *Morris v. Berryhill*, a Dr. Gomez initially opined that the claimant had "no limitation in mental function," but ten months later he claimed to observe "moderate[]" limitations in "most areas of mental functioning." 721 F. App'x 25, 26 (2d Cir. 2018) (summary order). The ALJ discounted the second opinion, and on appeal, the claimant argued that he should not have done so without first obtaining three of Dr. Gomez's treatment notes. *Id.* at 26-27. The Second Circuit rejected her claim, but it did so for several reasons that do not apply here. To begin with, the Court of Appeals observed "no evidence that the alleged appointments were held or that the corresponding records exist," *id.* at 28, but here, the record provides reasons to believe that as many as twenty-one treatment notes are missing. (R. 620 (opinion stating that Dr. Buonopane saw the Plaintiff an "[a]verage [of two times per] month or more" over a one-year period); R. 463 (indicating that only three treatment notes were in the record).) Second, the *Morris* record contained abundant evidence from Dr. Gomez himself and from other physicians covering the period during which the claimant claimed to have been deteriorating, *Morris*, 721 F. App'x at 28, but in this case, Dr. Buonopane's treatment notes would be essentially the only psychiatrist evidence during the period in which the Plaintiff's condition allegedly descended into psychosis. Third and relatedly, the claimant in *Morris* came forward with no reason to suppose that the missing records would document "a serious and critical medical event that could materially change the weight of the evidence on the disability determination," *Morris*, 721 F. App'x at 28, but in this case, the missing records would likely document whatever events caused Dr. Buonopane to diagnose a psychotic condition.

The Commissioner also argues that the ALJ's decision should be affirmed because the Plaintiff "could have taken further steps to obtain this evidence" herself (Def.'s Memo., at 27), but the Court disagrees with this claim as well.  The Commissioner cites two cases in support of this proposition (*id.* at 30), but both are distinguishable.  In *Curley v. Commissioner of Social Security*, the ALJ opened the hearing by asking the claimant's counsel whether the record was missing anything, and counsel "did not state that he had any . . . records that needed to be obtained."  808 F. App'x 41, 44 (2d Cir. 2020) (summary order).  And in *Bushey v. Colvin*, the claimant's attorney made "insufficient efforts" to obtain the missing records, and on appeal she was unable to "point[] to any evidence . . . that was not included in the record but could have influenced the Commissioner's decision."  607 F. App'x 114, 115 (2d Cir. 2015 (summary order).  In this case, by contrast, the ALJ did not ask the Plaintiff's counsel whether the record was complete (R. 106-07, 122-23); if he had, counsel's answer clearly would have been "no" (*see* R. 327); and counsel did make efforts to obtain the records herself before the hearing.  (R. 312-14.)  Moreover, the records could have influenced the Commissioner's decision.  As noted above, Dr. Buonopane's opinion likely would have supported disability if it had been credited, but the ALJ did not credit it in part because he regarded the partial progress notes as "generally unremarkable."  (R. 26.)

Finally, the Commissioner argues that the ALJ discharged his duties by keeping the record open, but this claim is unpersuasive as well.  The Commissioner cites *Jordan v. Commissioner of Social Security* (Def.'s Memo., at 32), but in that case the claimant's counsel "did not request the ALJ's assistance" in obtaining the missing documents, and after the hearing he contacted the SSA and confirmed that he had nothing to add to the record.  142 F. App'x 542, 543 (2d Cir. 2005) (summary order).  Here, by contrast, the Plaintiff's counsel did ask the ALJ for help (R. 312-14), and she did not tell the SSA that the record was complete.  (*Cf.* R. 327.)  The Commissioner also

27

cites *Lesanti v. Commissioner of Social Security* (Def.'s Memo., at 32), but in that case the claimant had not asked the ALJ to issue a subpoena, and on appeal to the district court she made no plausible argument that the missing records would have affected the result.  436 F. Supp. 3d 639, 649-50 (W.D.N.Y. 2020).  That is not the case here.

The Court wishes to be clear that the decision whether to issue a subpoena is within the ALJ's discretion, and that it will be a rare case indeed in which the boundaries of that discretion are exceeded.  But an ALJ traverses those boundaries when (1) the record contains a treating physician's opinion that would likely confirm disability if credited; (2) the record does not contain the opining physician's progress notes from the visits in which the bases for important diagnoses (*e.g.*, psychosis) would have been documented; (3) one basis for discrediting the opinion was a perceived inconsistency with the partial progress notes in the record; (4) one basis for the finding of no disability was a perceived inconsistency between the claimant's statements about her symptoms and the objective medical evidence; (5) the claimant and the opining physician had a therapeutic relationship of meaningful duration, and the missing records were potentially voluminous; (6) the opining physician was the only physician to observe significant and potentially disabling health conditions; (7) the claimant asked the ALJ to subpoena the missing records; and (8) the ALJ did not issue the subpoena, and did not explain his reasons for failing to do so.  All eight considerations apply in this case, and the Plaintiff is therefore entitled to remand.

## IV.   CONCLUSION

When a district court concludes that an ALJ failed in his duty to develop a full record, a plaintiff's additional arguments ordinarily do not need to be addressed.  *E.g., Mungin v. Saul*, No. 3:19-cv-233 (RMS), 2020 WL 549089, at *10 (D. Conn. Feb. 4, 2020) ("The Court declines to address the plaintiff's remaining arguments because upon remand and after a de novo hearing, [the

ALJ] shall review this matter in its entirety.") (internal quotations omitted) (citing *Faussett v. Saul*,

2020 WL 57537, at *5 ); *see also Delgado v. Berryhill*, No. 3:17-cv-54 (JCH), 2018 WL 1316198,

at *19 (D. Conn. Mar. 14, 2019) (holding that because the case is "already being remanded for

other reasons," and "because [the plaintiff's] RFC may change after full development of the

record," the ALJ is likely to need to reconsider the other steps in the five-step analysis)).   On

remand, the ALJ should address the additional claims of error not discussed by the Court.   *Pacheco*

*v. Saul*, No. 3:19-cv-00987 (WIG), 2020 WL 113702, at *8 (D. Conn. Jan. 10, 2020) ("On remand,

the Commissioner will address the other claims of error not discussed herein."); *see also Moreau*

*v. Berryhill*, 2018 WL 1316197, at *4 ("Because the court finds that the ALJ failed to develop the

record, it also suggests that the ALJ revisit the other issues on remand, without finding it necessary

to reach whether such arguments would themselves constitute legal error justifying remand on

their own.").

     For the reasons stated above, the Plaintiff's Motion for Order (ECF No. 17) is **GRANTED**

and the Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No.

21) is **DENIED.**   The Commissioner's decision is vacated and the case is remanded for further

administrative proceedings consistent with this opinion.   In particular, the Commissioner is

directed to subpoena the records from Dr. Buonopane, to evaluate those records while determining

whether the Plaintiff's impairments render her disabled, and to consider the other claims of error

that the Plaintiff raised in her brief before this Court.

     This is not a recommended ruling.   The parties consented to the jurisdiction of the

undersigned Magistrate Judge, who may therefore direct the entry of a judgment of the district

court in accordance with the Federal Rules of Civil Procedure.   (ECF No. 10.)   Appeals may be

made directly to the appropriate United States Court of Appeals.   *See* 28 U.S.C. § 636(c)(3); Fed.

R. Civ. P 73(c).  The Clerk of the Court is respectfully directed to enter judgment in favor of the Plaintiff, and to close the case.

So ordered at Hartford, Connecticut this 13th day of May, 2024.


$\hspace{3cm}$ */s/ Thomas O. Farrish*
$\hspace{3cm}$ _____
$\hspace{3.5cm}$ Hon. Thomas O. Farrish
$\hspace{3.5cm}$ United States Magistrate Judge